## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JACQUELINE JOHNSON, | : | |
| | : | |
| Plaintiff, | : | No. 3:17-CV-1995 (VLB) |
| | : | |
| v. | : | |
| | : | January 2, 2020 |
| JPMORGAN CHASE BANK, N.A., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT
## [DKT. 60]

*Pro se* Plaintiff Jaqueline Johnson ("Johnson") asserts claims against Defendant JPMorgan Chase Bank, N.A. ("JPMC") arising out of the parties' mortgage agreement. In her Amended Complaint, Johnson alleges that (1) JPMC violated the Connecticut Unfair Trade Practice Act ("CUTPA"), (2) JPMC breached its contract with her, and (3) JPMC negligently and intentionally inflicted emotional distress upon her. [Dkt. 34 (Third Am. Compl.)]. Now before the Court is JPMC's Motion for Summary Judgment on all counts. *See* [Dkts. 60 (Mot. Summ. J.), 61 (Mem. in Support), 62 (JPMC Statement of Facts)]. Johnson opposes the Motion. *See* [Dkts. 67 (Mem. Opp. Mot. for Summ. J.), 68 (Johnson Statement of Facts)]. For the reasons given below, JPMC's Motion is GRANTED.

### I.      Standard for Motion for Summary Judgement

Summary judgment should be granted "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed.**

R. Civ. P. 56(a). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

"In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255)). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir 1996). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal citation and quotation omitted). The Court "liberally construe[s] pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party asserting that a fact is or is not true must present admissible evidence to support their assertion. Fed. R. Civ. P. 56(c)(2).

Where a defendant presents admissible evidence tending to show there is no genuine issue of material fact for a jury to decide and she is entitled to judgment as a matter of law, a plaintiff must produce admissible evidence raising a genuine issue of material fact to defeat summary judgment. Fed. R. Civ. P. 56(c). Rule 56(c) "mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to a party's case, and on which that party will bear the burden of proof at trial." *Bedor v. Friendly's Ice Cream Corp.*, 392 F. Supp. 2d 367, 373 (2005) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)).

A party's own affidavit may be enough to fend off summary judgment if it is based on personal knowledge and is consistent with prior pleadings and testimony. *See Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 53 (2d Cir. 1998) (reversing district court grant of summary judgment because district court did not give party's affidavit weight and affidavit was consistent with prior pleadings and testimony); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (same). However, if the affidavit is inconsistent with prior deposition testimony or pleadings, it does not create "a genuine issue for trial." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *see Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 106 (2d Cir.2011) ("in certain extraordinary cases, where

the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.").

I.     Background[1]

A. Original Mortgage Agreement

On October 3, 2005, Johnson purchased real property located at 157 Jonathan Drive, Stamford, CT. [Dkt. 62 (56(a)(1) Statement of Facts) ¶ 1]. Johnson financed the purchase with a mortgage loan in the amount of $798,750.00 from Washington Mutual Bank. [Dkt. 62-2 (Ex. B, Johnson 2005 Mortgage Note)]; [Dkt. 75-1 (Ex. A. Johnson 2005 Mortgage Deed)]. A number of provisions from the Mortgage Deed and Mortgage Note are relevant here.

i.     Mortgage Note: Payment Provisions

---

[1] The facts are taken from the undisputed facts in the parties' Local Rule 56(a) Statements and exhibits submitted in support of and in opposition to JPMC's Motion for Summary Judgment, except as noted.

Johnson has not complied with her obligations under D. Conn. L. Civ. Rule 56(a). Her submissions fails to comply with Local Rule 56(a)(3) "specific citation" obligation: "The 'specific citation' obligation of this Local Rule requires counsel and *pro se* parties to cite to specific paragraphs when citing affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." Given Johnson's *pro se* status, this Court will consider her arguments in opposition to JPMC'ss motion to the extent that she provides admissible evidence raising a genuine issue of material fact. *See Halkiotis v. WMC Mortg. Corp.*, 144 F. Supp. 3d 341, 345n.2 (D. Conn. 2015) (considering *pro se* plaintiff's opposition to defendant's summary judgment despite plaintiff's failure to comply with Local Rule 56(a)); *Wilks v. Elizabeth Arden, Inc.*, 507 F.Supp.2d 179, 185–86 (D. Conn.2007) (same).

The Amended Paragraph 3 of the Note, "Payments," provides in relevant part:

>  (A) Time and Place of Payments: I will make my monthly payments on the first day of each month beginning on November, 2005. Until the first day of November, 2010 I will pay only the interest on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest-by making payments every month as provided below. I will make these payments every month until I have paid all of the Principal and interest and other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal…

>  (B) Amount of My Initial Monthly Payments
>  Each of my initial monthly interest-only payments will be in the amount of U.S. $3.677.59 . This amount may change.

[Dkt. 62-2 at 7 (9/28/05 Addendum to Fixed/Adjustable Interest Rate)].

   *ii.*   *Mortgage Deed*

The mortgage deed provides the following relevant definitions:

>  (K) "Escrow Items" means those items that are described in Section 3.

>  (N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

 [Dkt. 75-1 (Johnson 2005 Open-End Mortgage Deed) at 2].  Under the first section of the Uniform Covenants, Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges, the mortgage deed provides:

>  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender

may require that any or all subsequent payments due under the Note and this Security Instrument be made in one of more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or
entity; or (d)  Electronic Funds Transfer...

<u>Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current</u>, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future<u>, but Lender is not obligated to apply such payments at the time such payments are accepted.</u> If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. <u>Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.</u> If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure….

*Id.* at §1 (emphases added). Under the second section of the Uniform Covenants, "Application of Payments or Proceeds," the mortgage deed provides:

<u>Except as otherwise described in this Section 2</u>, all payments accepted and applied by Lender shall be applied in the following order of priority: (a)  interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. <u>Such payments shall be applied to each Periodic Payment in the order in which it became due</u>. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note. If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. <u>If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due</u>…

*Id.* at §2 (emphases added). Under the third sections of the Uniform Covenants, "Funds for Escrow Items," the mortgage deed provides:

> Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds) to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 6; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 70. <u>These items are called 'Escrow Items</u>….

*Id.* at §3 (emphases added).

### B. Johnson's Relationship with JPMC & Mortgage Modification

In September 2008, JPMC acquired Johnson's mortgage. [Dkt. 62 ¶ 5]. Johnson made her regularly scheduled interest only payments through March 2009. [Dkt. 62 at ¶ 6]. In March 2009, the assessment of a City Tax and delinquent "P&I tax" caused Johnson's escrow balance to fall to negative $14,475.37. [Dkt. 62-3 (Johnson Mortgage Payment Invoice) at 3]. Johnson was also late on her April 2009 monthly mortgage payment by one month and did not make up her missed payment. *Ibid.*; [Dkt. 62-1 (Ex. A., 10/30/2019 Johnson Dep.) at 49].[2] There is no evidence these payment defaults were cured.

Between May 2009 and January 2013, Johnson continuously had the intent and ability to make her mortgage payments of $3677.58 and did so, except where

---

[2] Johnson disputes this fact in her own statement of facts, writing that she "denies making any late payments to JPMC and her record proves otherwise by her prior payments to WAMU and subsequent record of payment after modification." [Dkt. 68 (56(a)(2) Statement of Facts) at ¶7]; *see* [Dkt. 67-1 (Johnson 5/24/2019 Affidavit) at ¶ 7-8, 11]. The Court finds that this claim does not create a genuine dispute of material fact given that Johnson had agreed, in deposition testimony, that she (a) at least occasionally made late payments; and (b) that she made a late payment in April 2009. *Hayes*, 84 F.3d at 619.

JPMC refused to accept them. [Dkt. 67-1 at ¶11]; *see* [Dkt. 74 (Auto-Pay Agreement for $3677.58) at 4-5]; [Dkt. 38 at 17 (Ex. 9, Johnson 10/29/2015 letter to Dimon)]. In August 2009, JPMC does not record receiving any payments from Johnson. [Dkt. 62-3 at 3]. In October 2009, JPMC began to hold in suspense payments which only covered Johnson's monthly mortgage payment and did not also cover her monthly escrow payment. *Ibid.* Johnson had made only one payment that covered both her mortgage and her escrow account by the end of 2009. *Ibid.* At that time, JPMC recorded Johnson as four months behind in mortgage payments, and Johnson's negative escrow balance grew to $18,292.43. *Ibid.* JPMC had also assessed nine late charges against Johnson, resulting in a late charge balance of $1,654.92. *Ibid.*

In early 2010, Johnson sought a mortgage modification. [Dkt. 62-1 at 38:18-38:24]. The mortgage modification process extended for over two years. *Ibid.* During this period, Johnson claims she was in severe emotional stress, such that, "for two and a half years [she] could barely eat." [Dkt. 62-1 at 113]; *see also id.* at 112-17.

From the beginning of 2010 until the date Johnson entered a Mortgage Modification Agreement in 2013, JPMC does not record any timely mortgage payments by Johnson.  [Dkt. 62-3 at 3-4]. JPMC does, however, record accepting eight payments from Johnson:  on January 5, 2010, on March 8, 2010, on March 26, 2010, on May 28, 2010, on August 27, 2010, on November 13, 2012, on December 7, 2012, and on January 14, 2013. *Ibid.* Only Johnson's first payment in this series, on January 5, 2010, was sufficient to pay both her monthly mortgage payment and her monthly escrow payment, or, in the terms of the mortgage deed, her full "Periodic

Payment". *Ibid.* JPMC held Johnson's remaining accepted payments in "suspense." *Ibid.* JPMC held such funds in an unapplied account until the account's balance was sufficient to pay both Johnson's agreed-upon mortgage payment and her monthly escrow payment, at which point JPMC would apply the funds to Johnson's mortgage and escrow accounts and would count Johnson as having made a monthly payment. *Ibid.*[3] Johnson produces no evidence to refute these facts.

After JPMC applied Johnson's payments to her mortgage and her escrow account, it counted her as having missed all of her payments between January 1, 2010 and January 1, 2013. *Id.* at 4; *see* [Dkt. 62-1 at 52].  At the time of the mortgage modification, JPMC also applied $5,265.40 to Johnson's negative escrow balance and $616.00 to her foreclosure fees. Ultimately, she owed $89,360.16 in delinquent interest. [Dkt. 62-5 at 3]. Relevantly, she also owed:

- $52,296.16 in escrow for unpaid city taxes and homeowner's insurance fees, after JPMC applied her suspended payments at the time of the mortgage modification. [Dkt. 62-3 at 4].
- $616.00 in foreclosure fees. *Ibid.* Her suspended payments were applied at the time of the mortgage modification to bring the foreclosure fee balance to zero. *Ibid.*
- Her late charge balance grew to $2,574.32, though it was waived at the time of the mortgage modification agreement *Id.* at 3; [Dkt. 62-5 (Ex. E, JPMC 5/19/2015 Letter to Johnson) at 3].

On January 29, 2013, Johnson signed a Mortgage Modification Agreement with JPMC. [Dkt. 62-4 (Ex. D, Johnson 2013 Mortgage Modification Agreement)].

---

[3] There is one exception to this pattern. On October 18, 2010, JPMC applied the entire unapplied balance (over $6,000, but less than a full combined mortgage and escrow monthly payment) to Johnson's negative escrow balance, apparently in preparation for foreclosing on her house. [Dkt. 62-3 at 3].

Under the Mortgage Modification Agreement, as of February 1, 2013, Johnson owed a New Principal Balance of $940,406.32. [Dkt. 62-4 at 2-3]. The New Principal Balance was divided into a Deferred Principal Balance of $112,836.88 and an Interest Bearing Principal Balance of $827,569.44. *Ibid.*; [Dkt. 62-1 at 74:4-74:22]. Johnson understood that she needed to sign and return the Mortgage Modification Agreement immediately to avoid foreclosure. [Dkt. 67--1 at ¶¶15-16]; *see also* [Dkt. 62-1 at 102:6-102:21]. Johnson has timely made every payment since she modified her mortgage in 2013. [Dkt. 34 at ¶31].[4]

In letters dated May 4, 2015 and July 22, 2015, Johnson requested information about the payoff amount of her modified mortgage. [Dkt. 62-7 (Ex. G, JPMC 10/15/2015 Letter to Johnson) at 1], [Dkt. 62-5 (JPMC 5/19/2015 Letter to Johnson) at 2]. In its May 19, 2015 response to Johnson's May request, JPMC informed Johnson of the existence of the Deferred Principal Balance, although it did not specify the amount. [Dkt. 62-5 at 5]; *see also* [Dkt. 62-7 at 3]. However, Johnson was aware by May 2015 that the amount of the deferred balance was $112,836.88. [Dkt. 62-1 at 129].[5]

In the same letter, JPMC also informed Johnson that the New Principal Balance was higher than the Original Principal Balance because of "interest for

---

[4] While this fact is alleged as part of the Third Amended Complaint, JPMC "does not dispute it." [Dkt. 61 at 7].

[5] Johnson disputes this fact in her own statement of facts, writing that she was not aware of the balance because she had received several conflicting statements about the balance. [Dkt. 68 at ¶ 19]; *see* [Dkt. 67-1 at ¶¶ 21-22]. Here again, the Court finds that Johnson's affidavit does not create a genuine dispute of material fact since Johnson agreed, in deposition testimony, that she was aware of the amount of the deferred balance. *Hayes*, 84 F.3d at 619.

missed payments from January 2010 to October 2012, the negative balance in the escrow account and foreclosure fees." [Dkt. 62-5 at 2].  While JPMC listed the amount of "delinquent interest" and foreclosure fees, it did not list the amount of her negative escrow account. *Ibid.* However, by May 2015, Johnson was aware of the full New Principal Balance that she owed. [Dkt. 62-1 at 126, 129]; *see also* [Dkt. 34 at 15 (Johnson 10/29/2015 Letter to JPMC) ("[P]enalties… increased our initial mortgage balance with Washington Mutual from $758,750 on November 1, 2005 to $903,389.92 with Chase on October 1, 2015")]. [6]

Johnson filed this lawsuit *pro se* against JPMC on November 30, 2017. [Dkt. 1]. JPMC only added a "Deferred Principal Balance" section to Johnson's statement in June 2018, after this lawsuit was filed. [Dkt. 67 at 23-25 (April 2018 Statement, May 2018 Statement, June 2018 Statement)]. This information is consistent with the information in the Mortgage Modification Agreement. [Dkt. 62-4].

## II.  Analysis

### A. CUTPA

Johnson alleges that, between 2015 and 2018, JPMC violated the Connecticut Unfair Trade Practices Act ("CUTPA") because JPMC intentionally failed to timely provide Johnson with complete information about the scope of her

---

[6] Johnson disputes this fact in her own statement of facts, writing that she denies she was aware of the balance because she had received several conflicting statements about the balance. [Dkt. 68 at ¶ 19]; *see* [Dkt. 67-1 at ¶¶ 21-22]. Here again, the Court finds that Johnson's affidavit does not create a genuine dispute of material fact since Johnson agreed, in deposition testimony, that she was aware of the full New Principal Balance owed. *Hayes*, 84 F.3d at 619.

mortgage. [Dkt. 34 at ¶¶ 30, 38-47]; [Dkt. 67 at 1-2].[7] Specifically, Johnson alleges that she requested information about the payoff balance of her mortgage in 2015, but JPMC intentionally and in bad faith delayed responding to her request, asking for over forty extensions to "research the case." [Dkt. 34 at ¶¶ 30, 38-47]; [Dkt. 67 at 1-2].[8] She alleges that JPMC's actions impeded both her ability to make full and timely mortgage payments and her ability to take advantage of a sale or refinance. [Dkt. 67 at 1].

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade

---

[7] Johnson also continues to argue that that she has a CUTPA claim because, between late 2010 and early 2013, JPMC misrepresented its loss mitigation policies, improperly lost and evaluated Johnson's loss mitigation applications, repeatedly requested duplicative or unnecessary information, and improperly charged fees and interests in the ultimate Modification. [Dkt. 67 at 1-2]; [Dkt. 69 at 2]. Apparently in anticipation of this argument, JPMC argues that the Mortgage Modification Agreement that Johnson ultimately signed was negotiated and was a good deal. [Dkt. 61 at 8].

The Court has already dismissed Johnson's CUTPA claims against JPMC's for acts and omissions before and during the 2013 mortgage modification process on the basis that they were time barred. [Dkt. 56 (Memo. of Decision on Mot. to Dismiss) at 7-9]. In its earlier Memorandum of Decision, the Court explained that JPMC's 2013 and pre-2013 conduct "ended when it offered Johnson a modification agreement." *Id.* at 8. The Court also found that the continuing course of conduct doctrine did not toll the statute of limitations. *Ibid.* The Court will not reiterate its decision here.

[8] Johnson also alleges that JPMC failed to include the full aggregate New Principal Balance, including the Deferred Principal Balance, on her mortgage payment invoices or periodic statements until May 20, 2018. [Dkt. 34 at ¶¶ 33-34]; [Dkt. 67-1 at ¶¶19-21,23]. The Court did not construe these allegations as supporting claims under CUTPA in its Memorandum of Decision on JPMC's Motion to Dismiss, and it declines to do so here. [Dkt. 56 at 6-11].

or commerce." Conn. Gen. Stat. § 42-110b(a).[9] A CUTPA claim may be brought by "[a]ny person who suffers any ascertainable loss of money or property." Conn Gen. Stat. § 42-110g(a). The Connecticut Supreme Court has established that the "cigarette rule" governs whether a practice violates CUTPA:

> "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]....
>      All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy.... Furthermore, a party need not prove an intent to deceive to prevail under CUTPA.

*Journal Pub. Co. v. Hartford Courant Co.,* 804 A.2d 823, 839 (Conn. 2002) (citations and internal quotation marks omitted), *cited in Lee v. AIG Cas. Co.,* 919 F. Supp. 2d 219, 222 (D. Conn. 2013).

The Court first finds that there is no evidence to support Johnson's claims that JPMC's alleged failure to provide her with information about her mortgage prevented her from making her full mortgage payments on time. Johnson has

---

[9] In its quotation of the statute, JPMC omits the words "or deceptive." [Dkt. 61 at 5].

"made every payment and further has never been late on any mortgage payment since JPMC's modification approval in 2013." [Dkt. 34 at ¶ 31].

The Court next considers Johnson's claims that JPMC's failure to provide her with complete information about her mortgage debt prevented her from taking advantage of a sale or refinancing option. Johnson alleges that JPMC intentionally and in bad faith delayed in responding to her 2015 requests for information about the payoff balance of her mortgage.

In response, JPMC argues it timely provided detailed responses to Johnson's 2015 inquiries about her loan balance. [Dkt. 61 at 7]. If JPMC were to show that this fact is not in dispute, it would be entitled to judgment as a matter of law because Johnson would be unable to show unfair conduct or substantial injury.

The Court finds that JPMC timely provided detailed responses to Johnson's 2015 inquiries. JPMC provides evidence that, on May 19, 2015, it sent Johnson a response to her May 4, 2015 letter which (a) gave her notice of the Deferred Principal Balance; and (b) gave her information about the total New Principal Balance by giving her information about the difference between the New Principal Balance and Johnson's original principal balance. [Dkt. 62-5 at 3]. This letter gave Johnson the information she would need to determine the full payoff balance from her account statements. It provides an explanation and computation of the principal balance.  Specifically, it states the full New Principal Balance is the sum of "the [original] principal balance, interest for missed payments from January 2010 to October 2012, the negative balance in the escrow account and foreclosure

fees." *Ibid.* The letter states the amounts of the missed interest – $89,360.16 – and the foreclosure fees – $616.00. From her own past statements, Johnson would know that the original principal balance was $798,750.00[10] and that the negative balance in her escrow account in January 2013 was $57,561.56 minus any unapplied payments. *See* [Dkt. 62-3 at 3]; [Dkt. 67 at 24 (Ex. D, 5/1/2018 Statement)] (displaying current escrow balance). Indeed, by May 1, 2015, Johnson was aware of the amount of the full New Principal Balance (less her payments) and that the full Deferred Principal Balance was "$112,000 and some change." [Dkt. 62-1 at 126, 129]; *see also* [Dkt. 34 at 15 (Johnson 10/29/2015 Letter to JPMC) ("[P]enalties… increased our initial mortgage balance with Washington Mutual from $758,750 on November 1, 2005 to $903,389.92 with Chase on October 1, 2015.")].

Johnson does not provide any evidence that she requested information about her payoff balance before May 2015. A fourteen-day delay is not an unreasonable delay. Thus, the Court finds that JPMC has shown that it timely provided a detailed response to Johnson's 2015 inquiry about her loan balance. As a matter of law then, JPMC did not violate CUTPA through unfair conduct which produced a substantial injury. Without reaching JPMC's additional arguments, the Court GRANTS JPMC's motion for summary judgment as to Johnson's CUTPA claims.

### B. *Breach of Contract*

---

[10] It is true that the May 19, 2015 letter misstated the original principal balance as $798,795.00, an overstatement of the original principal by $45.00. [Dkt. 62-5 at 3]. But given the numerous other places in which Johnson would have had this number, the Court does not find this misstatement material.

Johnson claims JPMC breached the mortgage agreement by failing to properly credit Johnson's mortgage payments before she entered the mortgage modification in 2013. *See* [Dkt. 34 at 1]; [Dkt. 71 at 3]. She also claims JPMC breached the covenant of good faith and fair dealing by continually and intentionally impeding her efforts to timely modify the mortgage, and deceitfully adding the Deferred Principal Balance of $112,836.88 to her outstanding principal balance payable under the mortgage modification. *See* [Dkt. 34 at ¶11, 33]. The Court addresses each claim in turn.[11]

### i.    *Failure to Properly Credit Payments*

Johnson alleges that JPMC failed to credit and/or misapplied payments Johnson made on her mortgage before the mortgage modification. *See* [Dkt. 34 at 1]; *see also* [Dkt. 71 at 3]. "The elements of a breach of contract claim are [1] the formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party, and [4] damages." *Claude v. Wells Fargo Home Mortg.*, No. 3:13-CV-00535 (VLB), 2014 WL 4073215, at *23 (D. Conn. Aug. 14, 2014) (quoting *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282 (2014)).

In its motion for summary judgment, JPMC argues that, in Johnson's deposition, Johnson stated that she did not make any payments for the period from December 2009 to January 2013, and so JPMC wasn't at fault in failing to credit the

---

[11] The Court reiterates that it dismissed Johnson's claim for breach of contract based on the theory that JPMC breached its obligation to accept payments under the 2010 Trial Mortgage in its Order on JPMC'S Motion to Dismiss. [Dkt. 56 at 11-12].

non-existent payments. [Dkt. 62-1 at 52]. But this deposition evidence is disputed – both by Johnson and by JPMC's other exhibits. Johnson argues that her deposition answer was based on the exhibit she was shown, rather than the actual facts. [Dkt. 72 (Pl's Response to Defd't's Reply) at 3.] Her argument that she was answering a different question is supported by the deposition transcript: immediately after Johnson affirms that she "hadn't made a payment on [her] mortgage for three years," she says that she missed payments because "Chase forced [her] to miss the payment." [Dkt. 62-1 at 52]. From the transcript, it appears that Johnson was not acknowledging that she had failed to make any payments but was instead asserting that Chase had not applied her payments. Throughout this litigation, Johnson has asserted that she continuously attempted to timely make her monthly mortgage payments of $3677.58 between 2009 and 2013.  Dkt. 67-1 at ¶11]; *see* [Dkt. 74 (Auto-Pay Agreement for $3677.58) at 4-5]; [Dkt. 38 at 17 (Ex. 9, Johnson 10/29/2015 letter to Dimon) (In October 2010, "[w]e offered to send an electronic check but your bank adamantly refused to accept any further checks").].

Further, other evidence offered by JPMC supports Johnson's claim that she made several payments to JPMC – and that they weren't immediately applied to her account. In its May 19, 2015 letter to Johnson, JPMC advised Johnson that it accepted her August 25, 2010 payment of $4,881.54 and her November 13, 2012, December 7, 2012 and January 14, 2013 payments for the amount of $4,203.24 each. [Dkt. 62-5 at 5]. Moreover, in its account information for Johnson's mortgage, JPMC records receiving eight payments from Johnson between January 1, 2010 and

January 14, 2013, of which three were received after November 30, 2011. [Dkt. 62-3 at 3-4]. The Court focuses on the three payments made after November 20, 2011 because the statute of limitations on a breach of contract action is six years, and this case was filed on November 20, 2017. *See* Conn. Gen. Stat. § 52-576; [Dkt. 1].

The last three payments together totaled $12,609.72. *Ibid.* On December 7, 2012, JPMC applied $3,677.58 of this money to Johnson's interest-only mortgage payment. *Ibid.* The same day, it applied $3050.74 to Johnson's escrow account, rather than her mortgage interest or principal. *Ibid.* JPMC applied the remaining $5,881.40 to escrow and foreclosure fees on February 1, 2013. *Ibid.* JPMC's evidence also shows that it maintained an "unapplied" account balance of between $1,500 and $5,881.40–not applying the money toward either Johnson's escrow or mortgage–for more than two months at the end of 2012 and the beginning of 2013. *Id.*

The Court finds that JPMC's actions in holding Johnson's payments in an "unapplied account" and in applying Johnson's payments to her escrow account are consistent with its contract with Johnson.[12]   First, the mortgage agreement

---

[12] The Court ordered the parties to file a copy of the text of Johnson's mortgage deed. [Dkt. 73]. The Court also ordered both parties to brief the issue of whether any language in the 2005 Note or 2005 Deed entitled the Note Holder or Mortgagee to return or hold in suspense any partial or insufficient payments, giving the parties 14 days to submit the briefing. *Ibid.* Both parties submitted briefs. [Dkt. 74 (Johnson's Brief on Mortg. Deed)]; [Dkt. 75 (JPMC Brief on Mortg. Deed)]. Therefore, the Court considers the question of contractual consistency as well. *See* Fed. R. Civ. P. 56(f)(3) ("After giving notice and a reasonable time to respond, the court may… consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute"); Fed. R. Civ. P. 56(e)(1) ("If a party fails to properly support an assertion of fact… the court may… give an opportunity to properly support or address the fact).

permitted JPMC to hold in suspense or reject payments made by a delinquent mortgagor:

> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current… but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.

[Dkt. 75-1 § 1]. JPMC was expressly authorized by the terms of the Mortgage Agreemetn to hold in suspense Johnson's delinquent mortgage payments. A banks' rejection or suspension of a delinquent mortgagor's payments is not a breach of contract where its actions are consistent with the Mortgage Agreement. *Halkiotis v. WMC Mortgage Corporation* 144 F. Supp. 3d 341, 355 (D. Conn. 2015) (finding that bank's rejecting or holding in suspense mortgagor's payments was not a breach of contract because its actions were consistent with the Mortgage Agreement). Between April 2009 and the date of the Mortgage Modification, Johnson, like the *Halkiotis* plaintiff, submitted payments that failed to include the escrow amount, and were therefore insufficient. [Dkt. 62-3 at 3-4]. Johnson also submitted one payment a month late, without making it up [Dkt. 62-1 at 49].  JPMC was therefore entitled to reject or hold her payments in suspense.

Next, JPMC did not breach the mortgage agreement by applying $3050.74 to Johnson's escrow account, even though she also had interest and principal payments due. Under Johnson's Mortgage Agreement, "if more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower

to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full." [Dkt. 75-1 at § 2]. "Periodic Payments" contain monthly escrow payments. [Dkt. 75-1 at (K), (N); *see also id.* at §§ 1, 2, 3].  The escrow payment in question was a Periodic Payment: $3050.74 was the amount of Johnson's monthly escrow payment, and JPMC applied it to her escrow account on the same day that it applied her monthly interest-only mortgage payment to her interest account. [Dkt. 62-3 at 4]. Moreover, JPMC applied the Periodic Payment on the day that it received a sum from Johnson such that her unapplied balance was sufficient to cover a full monthly payment. *Ibid.* Therefore, this escrow payment was consistent with the mortgage agreement.

Finally, JPMC did not breach the mortgage agreement by applying the remaining $5,881.40 to escrow and foreclosure fees on February 1, 2013. *Ibid.* February 1, 2013 was the date that the modification took effect, and Johnson's previous escrow and foreclosure fee balances were rolled into her New Principal Mortgage, and before any interest became due. [Dkt. 62-4 at § 2.C ("Interest will begin to accrue as of February 1, 2013" on the new balance).] Therefore, JPMC effectively applied these funds to the loan principal at a time when there was no outstanding interest, consistent with general priority order set out in the mortgage deed. [Dkt. 75-1 at §2 ("Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a)  interest due under the Note; (b) principal due under the Note")]. And, JPMC had no obligation to apply the funds before undertaking the modification because the unapplied fund balance could not cover a full monthly payment. *See*

*id.* at § 1. Therefore, this payment was also consistent with the mortgage agreement.

Johnson makes two arguments in response: first, that she did make her payments of interest; and second, that she was confused because of her verbal trial mortgage with JPMC during that period. [Dkt. 74 at 1, 3].

First, Johnson argues that her payments were always sufficient because she used an auto payment system that automatically deducted the full mortgage payment from her account on the agreed-upon date. [Dkt. 74 at 1, 4]. Other evidence supports the inference that Johnson did not consistently make such payments. [Dkt. 62-4]; [Dkt. 62-1 at 49]. In addition, Johnson did not always use auto-pay and JPMC did not permit her to use auto-pay when the mortgage was in default, as it was allowed to do under the contract. [Dkt. 38 at 17 (Ex. 9, Johnson 10/29/2015 letter to Dimon)]; [Dkt. 75-1 at § 1].

But even assuming that Johnson did make a $3,677.58 payment every month between 2009 and 2013, the Court still finds that Johnson has not met her burden to show that her monthly payments were sufficient, because such an amount does not include the escrow payment that Johnson was also obligated to pay on a monthly basis. As explained above, the amount of Johnson's required monthly "Periodic Payments" included a sum for escrow. [Dkt. 75-1 at (K), (N); *see also id.* at §§ 1, 2, 3].

Second, Johnson argues that "[c]onfusion reigned supreme during this period with JP Morgan Chase's scheme of a 'Verbal Trial Mortgage.'" [Dkt. 74 at 2]. The Court understands Johnson to argue here that her mortgage was modified by a

verbal modification agreement.  The Court finds this "contention foreclosed by the statute of frauds." *Halkiotis*, 144 F. Supp. 3d at 355. Under the Connecticut Statute of frauds,

> No civil action may be maintained in the following cases unless the agreement, or a memorandum of  the agreement is made in writing and signed by the party… to be charged: (4) upon any agreement for the sale of real property…; or (6) upon any agreement for a loan in any amount which exceeds fifty thousand dollars.

Conn. Gen. Stat. § 52-550. This statute applies to modifications to existing mortgage agreements, such that only written mortgage modifications have effect. *See Halkiotis*, 144 F. Supp. 3d at 355 (collecting Connecticut cases). Johnson neither claims nor presents any evidence that the Verbal Trial Mortgage was ever in writing,[13] and so it is undisputed that any verbal modification did not alter Johnson's contractual obligations or JPMC's contractual right created by the mortgage. The Court GRANTS JPMC's Motion for Summary Judgment as to this breach of contract claim.

### ii.    Covenant of Good Faith and Fair Dealing – Addition of Deferred Principal Balance

"[T]he duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Caires v. JPMorgan Chase Bank, N.A.*, 880 F. Supp. 2d 288, 307 (D. Conn. 2012) (quoting *Rafalko v. Univ. of New Haven*, 129 Conn. App. 44, 51 (2011)). "To constitute a breach of [the implied covenant], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she

---

[13] The Court notes that JPMC did send Johnson acknowledgments of a Modification Trial Period Plan on June 24, 2010 and July 24, 2010. [Dkt. 38 at 8, 9, 10]. However, none of these acknowledgments specifies the interest rate/monthly mortgage payment for the trial period.

reasonably expected to receive under the contract must have been taken in bad faith." *Kollar v. Allstate Ins. Co.*, No. 3:16-CV-01927, 2017 WL 3222535, *5 (D. Conn. July 28, 2017) (internal citations and quotation marks omitted). "Bad faith requires fraud, a 'design to mislead or deceive another,' or 'a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's duties, but by some interested or sinister motive.'" *Id.* (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004)).

Johnson alleges that JPMC deceitfully added a Deferred Principal Balance of $112,836.88 to her account in June 2018 and also "continually and intentionally impeded Plaintiff's ability to modify the mortgage." [Dkt. 34 at ¶33];  [Dkt. 56 at 13-14].

JPMC argues "that there are no facts in the record to support [Johnson's] allegations that [JPMC] was intentionally and deceitfully keeping this information from Johnson. In fact, the record indicates the exact opposite." [Dkt. 61 at 10]. JPMC provides evidence that the Mortgage Modification Agreement that Johnson signed in 2013 explicitly provided that "$112,836.88 of the new principal balance shall be deferred, and [Johnson] will not pay interest or make monthly payments on this account." [Dkt. 62-4 at 3]. Further, in April 2015, Johnson received a statement indicating that there was a deferred balance, [Dkt. 62-5 at 5], and in a letter to JPMC in May 2015 she acknowledged both that she was aware of the full New Principal Balance and that she was aware of the existence of a Deferred Principal Balance of $112,000 "and some change." [Dkt. 62-1 at 126, 129]; *see also*

[Dkt. 34 at 16 (Johnson Letter to JPMC, October 29, 2015, referring to the full amount of the New Principal Balance)].

In response, Johnson states that her monthly statements from JPMC did not reflect the existence of the Deferred Principal Balance of $112,836.88, that she did not receive a "formal mortgage invoice" until after filing this case, and that she was given conflicting information in response to her inquiries. [Dkt. 67-1 at ¶¶ 18-20, 22]. She alleges that these actions were taken with a motive "to foreclose on homes." [Dkt. 34 at ¶11].

To successfully challenge the admissible evidence offered by JPMC and survive summary judgment, Johnson must raise a genuine issue of fact for a jury by offering admissible evidence of JPMC's deceitful, false or dilatory conduct or improper motive. Fed. R. Civ. P. 56(c)(2). Johnson offers no such evidence. First, Johnson offers no admissible evidence tthat she had a right to a mortgage modification under her Mortgage Agreement, and the Court's agreement reveals none. [Dkt. 75-1, Dkt. 61-2]. Instead, she offers only her characterizations of their actions and several media articles and watch-dog reports. [Dkt. 68 at Ex. C]. These are not sufficient.

The media articles Johnson offers are inadmissible hearsay. Fed. R. Evid. 802. They are also inadmissible prior bad act evidence which cannot be offered, as Johnson tries, to prove a party acted in conformity with the prior conduct.  Fed. R. Evid. 404. Therefore, the Court does not give them weight.

Next, Johnson's characterization of JPMC's actions is insufficient evidence that JPMC acted in bad faith, that is, with a motive to foreclose on homes. "A bare

assertion that [the mortgage servicer defendant] acted in bad faith in its dealings with [the plaintiff]…[is] insufficient to survive summary judgment." *Halkiotis,* 144 F. Supp. 3d at 359 (granting mortgage servicer defendant's motion for summary judgment on breach of implied covenant of good faith and fair dealing claim where mortgage servicer failed to communicate amount of escrow funds needed for single payment). JPMC has provided evidence that it disclosed to Johnson the existence and amount of the Deferred Principal Balance and there is no evidence JPMC acted in bad faith by concealing the Deferred Principal Balance. The Court GRANTS summary judgment on this claim.

### C. *Emotional Distress Claims*

In her Third Amended Complaint [Dkt. 34], Johnson alleges intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at ¶¶50-53. Specifically, Johnson alleges that JPMC "maliciously and intentionally inflicted emotional pain, suffering and distress with their deceit and the gauntlet to delay and process the mortgage modification, with a clear intent to trigger a foreclosure. [Dkt. 34 (Third Am. Compl.) at ¶36].

Both claims are subject to a three-year limitations period. Intentional infliction of emotional distress claims must be brought within three years of the "act or omission complained of."   Conn. Gen. Stat. Ann. § 52-577 (setting out limitations period for torts); *see also Watts v. Chittenden*, 596, 22 A.3d 1214, 1226 (Conn. 2011) ("Although we recognize the continuing course of conduct doctrine in cases of intentional infliction of emotional distress…if no conduct has occurred within the three year limitations period set forth in § 52–577, the plaintiff will be

barred from recovering for the prior actions of intentional infliction of emotional distress."). Negligent infliction of emotional distress claims must be brought within two years of the "date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered," and "no… action may be brought more than three years from the date of the act or omission complained of." Conn. Gen. Stat. Ann. § 52-584 (setting out limitations period for negligence actions).

JPMC argues that all of the conduct which Johnson claims caused her emotional distress occurred prior to 2013. [Dkt. 61 at 12]. Indeed, the allegations in Johnson's complaint supporting her emotional distress claim all occur before she received the January 29, 2013 loan modification. *See* [Dkt. 34 at ¶¶ 11, 12, 13, 14, 36]; *see also* [Dkt. 62-1 at 113 ("And then you make the mistake of asking the bank for a modification…for two and a half years I could barely eat")]. JPMC argues that Johnson's claims are thus barred by the statute of limitations because January 29, 2013 occurred more than three years before Johnson filed this suit on November 30, 2017. [Dkt. 1]; [Dkt. 61 at 11-13].

In her Opposition memorandum, Johnson repeats that her emotional distress claims "concern JPMC's negligence in failing to provide a single point of contact and its repeated misplacing and thereafter re-solicitation of mortgage modification applications; and hereafter continuing to inflict undue stress upon her," thereby confirming that such conduct occurred before she entered the Mortgage Modification Agreement in 2013. [Dkt. 67 at 3]. Johnson's claims based on this conduct are barred by the statute of limitations unless an exception applies.

Johnson argues that the limitations period has not run because JPMC continues to undertake reckless and extreme or outrageous conduct. *Id.* at 3-4. The Court construes this argument as one that the statute of limitations should be tolled under the continuing course of conduct doctrine. A continuing course of conduct will toll the statute of limitations if the defendant "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Evanston Ins. Co. v. William Kramer & Assocs., LLC*, 890 F.3d 40, 45 (2d Cir. 2018) (citing *Flannery v. Singer Asset Fin. Co.*, 312 Conn. 286 (Conn. 2014) (internal citations and quotation marks omitted)).

Johnson alleges the following three points to support her argument that JPMC has engaged in a continuing course of conduct which tolls the statute of limtiations. First, she claims JPMC blocked her from paying her mortgage online. [Dkt. 67-1 at ¶ 24]. Second, she cites JPMC's "employment of its massive legal resources in an attempt to suffocate Plaintiff's legitimate and documented claims." [Dkt. 72-1 at 4]. Last, Johnson claims that, during her October 30, 2018 deposition, she needed to take two recesses as a result of being "emotionally and uncontrollably overwhelmed with reliving the memory of JPMC's conniving and unethical behavior." [Dkt. 67-1 at ¶26].

As a matter of law, these points do not constitute a continuing course of conduct. First, the Court has previously held that the fact that JPMC blocked Johnson from paying her mortgage online does not toll the limitations period for its pre-2013 conduct because JPMC has no duty to allow Johnson to pay her

mortgage online and because JPMC's conduct in refusing to allow Johnson to pay her mortgage online is unrelated to its conduct in processing Johnson's modification application. *See* [Dkt. 56 (Mem. of Decision on Mot. To Dismiss) at 8-9].

Next, the Court construes Johnson's claim about JPMC's litigation strategy to be a claim that JPMC is litigating in bad faith. While such conduct would violate a duty to Johnson and would have some connection to JPMC's conduct in handling Johnson's mortgage modification application, Johnson offers no admissible evidence supporting this claim. As repeatedly noted above, to survive summary judgment, an opposing party must offer admissible evidence raising a genuine issue of material fact for a jury to decide. Fed. R. Civ. P. 56(c). Johnson has failed to meet this standard.

Finally, while Johnson's claim that she continues to be emotionally affected by the events leading up to her mortgage modification claim establishes the lingering effects of JPMC's pre-2013 conduct, the allegation does not establish that JPMC engaged in reckless, extreme, or outrageous conduct *after* 2013. Thus, the continuing course of conduct doctrine does not toll Johnson's emotional distress claims.

The Court finds that all of of the conduct that Johnsons alleges as the grounds for her emotional distress claims occurred before she signed the January 29, 2013 Modification Agreement. Her claims are time barred because they were not asserted within three years, the relevant limitations period. Therefore, it GRANTS JPMC's Motion for Summary Judgement as to these claims.

III.    **Conclusion**

   **For the foregoing reasons, the Court GRANTS JPMC's motion for summary judgment. The Clerk is directed to enter judgment in favor of JPMC and close this case.**

   **IT IS SO ORDERED.**

   **_____/s/_____**
   **Hon. Vanessa L. Bryant**
   **United States District Judge**

**Dated at Hartford, Connecticut: January 2, 2020.**